Good morning. Illinois Appellate Court First District Court is now in session. The Second Division, the Honorable Justice Nathaniel House presiding. Case number 22-1594, People v. Daniel Martinez. Good morning, ladies and gentlemen. My name is Nathaniel House. I'm a judge of the Illinois Appellate Court and presiding over this case with me are Justices Margaret McBride and Cynthia Cobbs. This case is being heard via the each party to have 10 minutes of uninterrupted presentation. And after that, each party makes their presentation, we may have questions. The appellant can reserve some time for rebuttal. Who represents the appellant in this case? Good morning, Your Honors. Jonathan Yeasting on behalf of Mr. Daniel Martinez. And who represents the appellee? Amy McGowan for the people. Okay. Do you have any questions about how we're going to proceed today? No, Your Honors. I would say, please feel free to jump in with questioning at any point in my presentation. Thank you. Very well. If there's no questions, we can proceed. The appellant, Mr. Yeasting, you may proceed when you're ready. Good morning, Your Honors, and may it please the Court. There's two broad issues raised in the briefing of this case. There's a Fourth Amendment claim regarding the circumstances of the arrest of Mr. Martinez and a Second Amendment challenge to Illinois statutory prohibitions on young adults, those 18 to 21, from carrying handguns. Now, I'd like to focus today on that Fourth Amendment claim and return to the Second Amendment toward the end. But I think it's worth noting that the law on that Second Amendment claim is likely to change in the next week. We're waiting for United States viewers Brahimi to come down from the U.S. Supreme Court. We're likely to see an opinion in that case in the next two weeks. And that's sort of expected to clarify these standards on who enjoys the right to bear arms. Now, as to the Fourth Amendment claim, the state's theory here is that this is a search incident to an arrest for drinking on a public way, where extra circumstances allowed the that theory doesn't work. First, the officer never had probable cause to arrest Daniel for drinking in public when he merely saw him standing on the sidewalk holding a beer bottle with some fluid in it. Second, the police can't enter private property to effectuate an arrest for a mere misdemeanor ordinance violation as minor as Chicago's drinking in public ordinance. Now, Officer Gonzalez testified, he searched my client incident to arrest for drinking in public. The officer, per his testimony, which for purposes this argument will even accept is true, saw Daniel standing on the sidewalk a few steps from his family home holding a bottle of Corona beer that the officer said had some fluid in it. Daniel walks those few steps to the front gate of his home. He's going through that gate as the officer comes out of the SUV. As he walks behind that gate, the officer announces this. Hold on one second. I repeat, this is only a drill. I'm sorry, you can proceed. We'll give you a time of that. Yeah, I'm happy to recess if it needs to be your own. No, they drill and to shelter in place. All right, we can go forward. Thank you, Your Honor. So the officer testifies that my client walks to the stairs of his home. He closes the gate behind him, marking off his home. The officer then opens that gate, steps onto the stairs, into the curtilage, grabs my client's hand, pulls it out of his coat pocket. As to what happened with the beer bottle, the officer merely testifies that he must have placed it down somewhere that the officer never saw. Now the state has the burden to prove the lawfulness of this arrest. This is a warrantless search following a warrantless arrest based on exigent circumstances. It bears the burden on all those issues. And when we come to this question of what is Lange versus California and Stanton versus Sims mean as to whether there's good faiths so the state could avoid the exclusionary rule, it bears the burden on that issue as well. And it's failed to meet that burden. First of all, there's a failure of the state to establish probable cause in this case. Chicago's drinking on a public way ordinance is not an open alcohol ordinance. It is lawful to stand on the sidewalk in Chicago with an open beer bottle, while it's not lawful to drink that bottle. So the question becomes, in those 8 to 10 seconds of this interaction, was there enough for Officer Gonzalez to warrant a reasonable portion of caution in the belief that my client had actually sipped that beer while on the sidewalk? And the circumstances don't do that. Sure, there might be cases where the surrounding circumstances don't require an officer to actually see an arrestee take a sip. If somebody's passed out on the sidewalk next to a half-empty fifth of liquor, or if the officer interrupts a raucous party and everybody throws slow-mo cups into the air. But that's not what happened here. The officer's testimony was just that he saw Daniel on the sidewalk, and then Daniel walked, not ran, a few steps toward the gate that leads to his home. And it's notable what the specific ordinance is. Chicago decided to set out different rules for possession of alcohol, whether one is a vehicle or whether one is out in public. It is not lawful. Chicago does not have an open container ordinance as to standing on the sidewalk. To authorize an arrest for merely standing there with a bottle of beer without much in the surrounding circumstances would essentially create one, despite the ordinance's intent to differentiate between having an open container in a car versus an open container on a sidewalk. Now, so I don't think we need to reach these more complicated constitutional issues on what does lying mean, what does good faith mean, what does the Second Amendment mean in this context, because of the long probable cause. But here, it's clear that at the time of this arrest, and it's much clearer today, that the officer can't intrude into curtilage, it can't intrude into what the law says is Daniel's home to effectuate a mere misdemeanor arrest without some more action and circumstances that he had just started the arrest before Daniel walked through that gate. Now, it's worth noting, it is settled at the time of this. Jardine came down some months before this arrest. Stanton v. Sims, which is site in the Reef, came down a month before this arrest. It's settled at the time that this fenced off area is to be treated as part of the home. The Seventh Circuit, talking about the law back in time, in the Banks case, said in the reply, toxic homes, so-called certain privilege, the front porch receiving the same protection as the home itself. That was a case where Springfield police saw a Snapchat of the defendant sitting on his porch with a gun. They knew he was a felon. They went over there, went up to that porch and arrested him. And the Seventh Circuit said that at least as of Jardine in 2013, you couldn't do that without a warrant, you needed something, the porch was part of the home and needed to be treated that way. So the state needs some exigency, some way to, some theory by which the officer could break through that gate, bust through the threshold of the curtilage to grab my client's arm and arrest him. Now, the Lang v. California decision that's featured in the opening brief comes down and that says, well, for mere misdemeanors, like Chicago's drunk on away ordinance, the government needs something else. Hot pursuit no longer applies. We need to look to other categorical circumstances. Before Lang came down, so the state, if Lang controls, Lang establishes there is a Fourth Amendment violation. So we get to this question of, is it a Fourth Amendment violation to which the exclusionary rule should apply? The state argues that the officer must have acted in good faith, but good faith only works where there's binding appellate precedent that specifically authorizes a particular practice. That's a quote from Davis v. United States. The Bonilla case from the Illinois Supreme Court on dog sniffs at apartment doors talks about binding appellate precedent that's specifically authorized. And the other question is, are the officers acting recklessly or with gross negligence as to the law? So a month before this search, in November 2013, the U.S. Supreme Court puts out Stanton v. Sims. And Stanton, it's a qualified immunity case. And the standard here is not as forgiving to the police as qualified immunity. But Stanton comes out and says, this area of the law is unsettled. There's currently a split of authority. Now that means that that officer in Stanton couldn't be held to civil liability. It also means that at least as far as the federal courts are concerned, there wasn't binding appellate precedents that would authorize hot pursuit into the curtilage for a mere misdemeanor arrest. So we started looking at what else is out there as to the legal landscape. And the state cites the 2008 decision to people beware. Does people beware authorize this so that a cop is not taking any kind of risk of negligence? And when you look at where, what where actually says is that the United States Supreme Court has been clear in these action circumstance cases that when there is no warrant, usually a police officer shouldn't be intruding into private property. Now that is when where's talking about Welsh toward the end of the opinion. Now, in where they say in this case, given the pursuit of this DUI, given that the DUI is a class A misdemeanor in Illinois, it's the most severe misdemeanor, it's punishable by just under a year in prison. We'll find on these facts that the arrest and search is authorized. But Chicago's drinking on a public way is a mere municipal ordinance with the most of six month penalty. Unlike the driving under the influence case and the public risk that entailed, Chicago's somebody standing on a sidewalk with a beer bottle with some fluid in it, and then walking to their home poses no great societal risk. So the state doesn't meet its burden to show that the exclusionary rule shouldn't apply in this case. And so whether this court decides to to make that decision under the where in Welsh back it was before Lang or makes it under Lang, you get to the same result, which is this intrusion into Mr. Martina's home to grab him and arrest him on the theory that he was standing on the sidewalk with a Corona bottle should lead to the suppression of the fruits of the resulting search. And now briefly, Your Honors, on those additional Second Amendment claims, I mentioned that Rahimi is expected to come down in the next week or so, and that's going to hopefully articulate some standards on this first prong as to who bears the right to bear arms. And there's also another matter in the briefing that this, even though the room is clear that when we get to the history, it's the government to try to meet its burden to find these laws around the time of the founding, the state in this case just hasn't done it. And maybe my frustration comes through in that reply brief, when they try these standing theories that this court has rejected in case even that gun case, or they try this notion that my client's not really raising a facial challenge, even though the Illinois Supreme Court said this was a facial challenge. Now, I understand the weight of an ask of saying, well, the state has forfeited this. I think the path forward is once Rahimi comes down, we end up in motions to cite or supplemental briefing. I'd rather see this issue mooted by that initial Fourth Amendment claim. Once we get into the history, the history, not just in this briefing, but elsewhere, sort of only points one direction. It was right after ratification, a Militia Act was enacted that required 18 to 21-year-olds to possess firearms. Now, even though that's limited to a militia, the Second Amendment has the purpose, which is to fulfill the militia. And this is something we see in the Pennsylvania case, in the Texas case, in the Minnesota case. When you look around for what kind of history there possessing or carrying firearms around the time of ratification, there just isn't any history that the state really has to support. So I would suggest that if it turns into the determinative issue, that more briefing on those Second Amendment claims be required. But as it stands in the briefing right now, this court should side with Mr. Martinez on. And thank you, Ernest. I'm ready for questions you may have. Thank you. Any questions? Justice Cobb? Justice McBride? I have a few. Thank you, Mr. Easton, for your argument. With respect to the drinking on the public way, are we looking at this from a probable cause standard or from a sufficiency of the evidence standard? It's a probable cause standard. So if it's probable cause, wouldn't the natural inference be that Mr. Martinez was drinking the beer? If the officer had stayed there when she saw the drink, yes. But given the specific circumstances, she is standing just off this second loft where disordinance multiply. We don't know. The officer didn't know if he was just taking that beer to throw it out. The officer, there just isn't enough information here to say that merely standing on the sidewalk outside of one's home holding alcohol is enough for an arrest. Was there testimony that Mr. Martinez was standing one residence away from the home? It's in front of the next property over. He takes a few steps toward the gate to return to his home as the officers pull up. And then isn't the he the natural read of the testimony is that he's passed the gate onto his property when that directive to stop is made. He did ask. There is no indication in the record that Mr. Martinez, in fact, stopped to turn to explain anything about the bottle of beer. No, it's the officer that has the obligation to have probable cause, Your Honor. It's not my client's obligation to try to stop an alternative explanation for why he had that bottle. No, Your Honor. Establishing probable cause is the state's burden here. In fact, it's the state's burden because they're making a warrantless arrest. No, I mean, at the suppression hearing itself. Does the defendant have any burden to offer at the suppression hearing an alternative explanation for why he had that bottle? No, Your Honor. But we do have now I'm taking Officer Gonzales testimony that he saw that bottle is true. I'm operating in that legal fiction, but the officer never recovers the bottle. He never photographs the bottle. And so we have the nursing student, Kendall Hanen's testimony that this just did not occur, that he was not on the street with that bottle. So my client can't offer some offer, you know, a fictional theory. You might be trapped in that officer's testimony for purposes of review, but my client certainly doesn't have to get up there and occupy that fiction to come up with some theoretical explanation of why he might be on the sidewalk. It is for the officer at that moment to make that determination, to warrant, you know, a reasonable personal caution in the belief that the crime of actually having drunk that alcohol while standing on the sidewalk has been committed. And my client walked back into his house. That's what one can do to avoid an unwanted encounter with the police. Now, the trial court discredited Ms. Hanen's testimony. Is that correct? She found the officer's testimony more credible. Yeah, that's right, Your Honor. That's why I'm generally arguing this as on the assumption that Officer Gonzales testimony would be taken as correct. But no, the defendant doesn't have to offer anything. It's the state that has to meet its burden to show why there's probable cause. You can correct me if I'm wrong, but I think at one but then at another point in testimony, he testified that he actually saw him take a drink. That's a conflict in the testimony. Who's required to resolve that conflict? Your Honor, I would disagree with the second part of that question as to whether he saw him taking a drink. What I believe what you're referring to is the officer is asked, did you arrest him that or something like that? And he says, yes, for drinking on public way. There in context is clear that the officers saying the name of the offense for which he was arresting Daniel and not saying that he actually saw him drink. There's another point where the state seems to start a question that would ask whether he actually saw him drink the alcohol and the state rephrases it to avoid getting that result. So I think it's fairly clear from the record that the officer's testimony doesn't say that he saw him drink. And given that the officers described this whole event as something like eight to 10 seconds, that omission is pretty notable. One other question and it relates to Santana and the distinction among misdemeanors. So in Santana, the misdemeanor was DUI. Santana was a felon. I think you're thinking about Welch. I am thinking about Welch. Thank you. But my point is, so we have the battling misdemeanors. Are we to measure the severity of a particular misdemeanor before we decide whether where applies or not? Well, Your Honor, it comes up in the context of good faith. Lange obviates this question as to whether there's a Fourth Amendment violation, but it's a question of did binding appellate precedent specifically authorize the intrusion into the home for this kind of arrest? And because where follows Welch to say that the intrusion should be unusual and limits it and says on facts for a Class A will accept it, that it isn't binding appellate precedent that would specifically authorize or something less. But it is your position, my last question, it is your position that where is not applicable in this case? Where only comes in on the question of whether the officer had good faith. As to whether the Fourth Amendment was violated, Lange controls that question and Lange says hot pursuit alone is not enough to enter the curtilage anymore. But now Lange was not in place in 2013 when this case was at trial. That's right, Lange was decided later. So we look to, on good faith, we look to what was the law in 2013. And that's why Stanton versus Sims is important. That's the qualified immunity case that says this area of the law is uncertain. We know Santana only applies to felonies. It's unsettled right now and Lange talks about Stanton. It's unsettled right now as to how hot pursuit would apply to misdemeanors. So given that that was the most recent state of the law, the state's search for something that would specifically authorize this officer to do that runs into Stanton. Now maybe Stanton didn't quite overturn where yet at that point, but that'd only be if we think where is a fact-bound decision that's looking at these matters as a sliding scale. And once we have that, we get to the conclusion that Welch says these kinds of intrusions should be rare, they should be unusual, and where is only applied when it was a class A to UI misdemeanor. So can that specifically authorize an arrest for something less for a mere ordinance violation of standing for a few seconds on the sidewalk near a bottle and one supposes the officer guessed drinking from it. Well, I'm going to finish with the mere ordinance violation though carries the penalty of six months in jail. I have no further questions. Thank you, Your Honor. I lost contact there for a period of time so I apologize and I can listen to the earlier comments. I do have a question. Is there your interpretation of this ordinance that you have to be drinking that you don't cite any case for that, do you? No, Your Honor. It's the we cite the general rules of construing ordinances because there just isn't that much case law out there on it. Okay. And if we find there was probable cause, you have another alternative argument, right? You would concede if there was probable cause you still prevail. If the officer had probable cause we still prevail because probable cause doesn't justify an officer intruding into the curtilage to conduct a warrantless arrest. And what about the, what is your interpretation of Lange? Is it retroactive or not? And if it is, what is your position then? Well, I think it's clear that Lange establishes that there is and wasn't fourth amendment violation so it becomes a good faith question. Can the state meet its burden to prove that the good faith exception to the exclusionary rule applies? And that's, you know, something less forgiving than qualified immunity. So the state has to show that this was specifically authorized in December 2013. And in November 2013, the United States Supreme Court says this area of the law is unsettled. So we look back and the one decision that might specifically authorize that the state claims is the Ware decision back in 2008. And that, well, that decision just doesn't specifically authorize it because it was a fact-bound decision at the end that relied on the severity of the offense. And so this court, if it applies the People v. Bonilla standards from the Illinois Supreme Court, starting to look to how analogous is the precedent at the time, should reach the because it wasn't the kind of statute binding appellate precedent that specifically authorized the police practice of intruding into the curtilage for a mere ordinance violation that the officer that applying the exclusionary rule in this case would be justified. And I do think going through the Bonilla case is helpful because that was dog sniffs in an apartment building hallway of the apartment building door. And even though there'd been lots of dog sniffs on the outside of cars cases, even though there'd been lots of cases involving eavesdropping, authorizing police eavesdropping when in the open area of the apartment building, and there's dozens of cases I think that the state cited in that case, because there wasn't anything on point to that narrow circumstance of a dog sniff outside of a closed apartment door, the good faith wasn't justified and suppressed the evidence. And I think the same is here. It's clear that today this is a Fourth Amendment violation. The question is, should we excuse that Fourth Amendment violation because it wouldn't have been grossly negligent for an officer in 2013 that he wouldn't have risked guessing wrong? And the answer to that is no, it was known to be an unsettled area of the law in 2013. So therefore, the notion that precedent specifically authorized going through that gate and grabbing my client's arm is simply incorrect. Well, you think that if something's unsettled, then that turns the tide in your favor? On the on the question of good faith. Yes, I'm asking you about on good faith. And this is how I settled. How can you discern or state with certainty that there wasn't good faith? Well, it's because of the language of the test. It's different than qual than qualified immunity, qualified immunity. If there's no on point law, it means we can't hold the officer simply liable. Good faith is and remains a different test. Because the question is whether binding appellate precedent specifically authorized the police practice, term specifically authorized coming from Davis, they emphasize they italicize that word authorized. All right. I think I think I understand your position. So so if, if there's no law on something, an officer is running the risk of suppression, we can't. The question wasn't directed to if there's no law. It was whether if there's conflicting precedence. I wasn't asking if there was no law. Now you're moving on to something else, aren't you? Well, in the conflicting precedent service, we do a survey of the legal landscape. And we have the issue here is we have a statement from the US Supreme Court a month before the search. So if we will, so whatever federal law that was on on this question, before November 2013, it ends up being obviated by the immediately recent US Supreme Court decision. So we looked at what were said, and we're never actually applied this notion that hot pursuit always works for all misdemeanors. Okay. Instead, where was a fact bound decision? You know, the police officer probably is not a lawyer. And he's gonna say, well, I, you know, follow where? And I'm not a lawyer. I don't know about all these little distinguishing marks you're making. How do we apply that? Well, you know, LaFleur and those other cases treat the police officers as if they were objective lawyers that that were giving CLEs on Fourth Amendment law. That doesn't reflect reality. And the reality here is this officer almost certainly had never heard of Stanton, probably had never heard of Ware, and probably didn't even think that this porch was curtilage that he could intrude into. He just thought it was something you can do. And so if we look at it subjectively, there's no indication that the officer's thinking this. But we, for whatever reason, the case laws come down that we survey that legal landscape. Is that the framework that I would design, Your Honor? No. But that's the framework that LaFleur and Davis and these other cases have put out. There's probably a basis in the Illinois Constitution to challenge this. We put that in at the end. But the current state of the law is we do a legal survey and think what a reasonable CLE giving police officer would do, I guess. Any other questions? I just want to follow up on what the police officer might have known. And I only bring it up because in your brief, you make sure to cite to recent policy from the Chicago Police Department on foot pursuit. Can't we assume from the fact that you cited this policy that is somewhat new that back in 2013, CPD had also informed or educated or trained their officers with respect to foot pursuit and what was possible? I'm just taking issue with the position that you take about what the police officers might have known in light of your citation to the recent policy coming out of CPD on foot pursuit. So I'm so certain that police officers would not have been advised that where was controlling and what was permissible in a foot pursuit. Here's where the foot pursuit policy comes in. Sometimes we see these suggestions coming out of Fourth Amendment cases that the exclusionary rule should only occur where it's going to deter some kind of police behavior that isn't a societal good. Now, the court today would be making the decision going forward. We can't deter what happened in the past, but we can deter things going forward. And the fact that the CPD has put out a policy limiting foot pursuits, you know, including the very brief pursuit that occurred in this case seems to say that we're not costing ourselves any societal good by deterring police from something that the CPD now says is a violation of policy. Now, I don't know what the CPD policies were. They were different back in 2013 on foot pursuits and entering buildings. I don't know how they were trained, but the question is, what would an objective officer know actually reading those decisions? And there's nothing there that specifically authorizes such that the state would have met its burden to show that the exclusionary rule shouldn't apply in this case because an objective officer would have known he was complying with the law. I have nothing further. Thank you, Justice House. Any other questions? All right. Very well then, Ms. McGowan, you may proceed when you're ready. Thank you, Your Honor. Thank you. Assistant State's Attorney Amy McGowan for the People. May it please the court. This is a case that I'm very interested in because the trial court properly denied his motion to suppress and the statute under which he was convicted and sentenced is constitutional. This was a fluid developing situation. The police were on 22nd place with two objectives, to serve a warrant and to watch for criminal activity. They saw two things, Eliseo Solano, the subject of the warrant, and defendant holding a partially full bottle of Corona beer, which led them to reasonably infer he was drinking on a public way. Based on these two things, Officer Gonzalez got out of his car. He yelled to defendant to stop, but defendant didn't comply. He and Solano fled. Defendant immediately and deliberately took measures to remove himself and what was in his possession from view of police. Defendant and Solano went through a gate onto the front lawn of an apartment building and the police followed. They had a warrant for Solano and believed defendant to have committed a crime. Further escalating the situation, defendant reached into his pocket and refused to comply with multiple orders to remove his hands slowly. Finally, Officer Gonzalez grabbed defendant wrist and found a fully loaded semi-automatic firearm in defendant's pocket. Defendant did not have a Floyd card. Defendant's reliance on Gaten and Lozano are unavailing. In Gaten, the court held that the officer had no reasonable suspicion to follow the defendant before seeing the cup of unidentifiable liquid and that the search was unreasonable because it was completely unrelated to the observed violation. And again, there it was a terry frisk. Here, officers saw defendant with an open partially full bottle of Corona beer, which per Gaten, a investigatory stop right then would have been permissible, but the search only happened after and refused to remove his hand. In Lozano, the court framed the question that whether a person's act of running in the rain while holding the front of his pocket was sufficient to justify an investigatory stop. And the court found no factor present. It was not high crime. It was the afternoon. There was no unprovoked flight and defendant's actions did not conform with the officer's knowledge of criminal activity. They simply wanted to know why he was running and was in his pocket. But here, all the factors are present. It is a high crime area. It's midnight. Again, unprovoked flight and officer Gonzalez reasonably believed defendant to be committing a crime. And there's the additional element of officer safety. Officer Gonzalez alluded to this point when he was saying that he searched defendant for two reasons. One, incident to arrest. And two, there was a reason he didn't know why defendant wouldn't take his hands out of his pocket. He said for officer and kind of interrupted himself. But a reasonable inference is he was talking about officer safety. The Fourth Amendment analysis requires common sense. The touchstone of the Fourth Amendment is reasonableness. And here, officer Gonzalez had eight to ten seconds that the entire encounter lasted from seeing defendant on the street with a beer to following them behind the gate and defendant refusing two to three commands to remove his hands from his pocket. Officer Gonzalez, using his common sense, did not act unreasonably. Further, this court's finding that defendant was not permitted to escape onto private property to thwart an arrest was correct, even for a misdemeanor at the time of his arrest. Defendant contends that post-slaying such an arrest would be impermissible, absent exigent circumstances, he argues, not present here. But this arrest was not post-slaying. Neither the officers nor counsel nor the court can be faulted for not following a case that didn't yet exist. What did exist and what argued to the court below was Welsh and Ware. The court found Welsh inapplicable because it was not hot pursuit. The officers did not attempt to stop the defendant on a public way despite having such an opportunity, but rather waited until he got home. Ware, on the other hand, in an Illinois Supreme Court case, categorically permitted an officer to enter a home without a warrant in pursuit of a fleeing misdemeanor suspect. Now, Lange, the case defendant featured in his opening brief, acknowledged that courts were divided. Some states were deciding on a case-by-case basis while other states adopted a categorical rule that hot pursuit into the home of a fleeing misdemeanor is always possible, always permissible. Lange cited Ware in the footnote as a case that adopted the categorical rule. So, yes, this was the rule in Illinois at the time of defendant's arrest. The police did not act unreasonably in following this rule and the court did not err in following this binding precedent. Moving on to the Floyd issue, defendant was convicted and sentenced for unlawful possession of weapon without a Floyd card. This is where we start. Even defendant agrees in his brief that the proper path is to first evaluate whether the statute creating the offense for which the without a Floyd. In our brief, we argue that Bruin endorsed an Illinois shell issue regime. And since the filing of our brief, multiple courts have agreed. Gunn and Hatcher, which I moved to cite, are just two examples. Defendant skips this first step in his facial challenge and only argues the burdens imposed upon 18 to 20-year-olds. But this short court shouldn't consider the constitutionality of subsection A13I because no sentence was imposed on that count. It merged into the no Floyd count. Now, I cite Hatcher, which found that regulations imposed on 18 to 20-year-olds for the sake of leaving no question unanswered. But the fact is that even for this court to disagree and reverse his conviction under that subsection, defendant still stands convicted and sentenced for possessing a weapon without a Floyd card. Defendant brought a facial challenge to that statute, which, yes, means it's his burden to show that under any set of facts, the statute is unconstitutional. His attempt to re-identify the claim as an as-applied challenge, it is reliably should not be permitted. The case law is clear that Illinois' Floyd requirement is constitutional. In conclusion, defendant's aggravated unlawful use of a weapon conviction under subsection A13C as convicted and sentenced is constitutional. His act of retreating behind a front gate in an attempt to evade officers did not render his subsequent arrest unconstitutional. This is particularly true when considering all of the circumstances. The high crime area, it was midnight, defendant entered the gate with the subject of a warrant, and then in between the police and the subject of the warrant, placed his hands in his pocket and refused to move it. The officer's actions in this eight to ten second moment were reasonable, and their following defendant onto his front lawn was permissible under where controlling Illinois Supreme Court law at the time. For these reasons, and those stated in our brief, I say you affirm defendant's convictions. All right, very well. Do we have any questions? Thank you, Justice House. Thank you, Ms. McGowan. It's your position that where applies because it was the case, it was the decisional law in effect at the time of the arrest and trial. Is that correct? Correct, Your Honor. It was binding Illinois Supreme Court precedent, and even Lange acknowledged that it adopted a categorical rule that flight into a home for a misdemeanor suspect was always permissible. Did Lange abrogate where though? Lange acknowledged that there were two views. One was a case-by-case basis, and the other was a categorical allowance, and they adopted the case-by-case basis. So yes, there is no more for misdemeanors. It has to be looked at now the circumstances of each offense incident. So if that is the case, why doesn't Lange apply retroactively to this case? Because the officers were acting in good faith. They were acting under the law at the time, and the court's ruling wasn't an error. The court too was acting following the law in effect at the time. So it's your position that as long as there's good faith, the laws or rules regarding retroactive application of decisional law don't apply to defeat the newer case law? I'm saying as far as the exclusionary rule, the purpose of the exclusionary rule is deterrence, to deter police officers from going too far. But when police officers are following binding law at the time, there's nothing to deter. They didn't do anything wrong. They acted lawfully at the time. Okay. You talk a lot about the gun in this case, but the gun really isn't the impetus or the genesis for the stop in the first place, or as Officer Gonzalez speaks about it, the custodial arrest. The gun doesn't come in until much later. You want to talk about the good faith. Does good faith apply now to the search on the curtilage, which the state, I believe, really concedes is curtilage? It is curtilage. Yes. It's the front lawn, and there are photographs and evidence that the gate comes right up to the sidewalk. We're not talking the threshold of the home, but even for a misdemeanor, the possession, or I'm sorry, the drinking of alcohol on a public way, punishable by six months and arrestable offense that allowed officers to follow defendant, where allowed officers to follow defendant into his home, and we didn't even get that far. He got to the front lawn. Considering the entire length of the infringement, it was eight seconds front lawn for his drinking on a public way was reasonable. I just want to make certain I understand. It's your position that these front stairs or steps on which I think they stop on the fourth or fifth step, it's interior to this gate. That is private space? It is private space. It is private space. It's not the interior of his home. I also think it's important to look at the expectation of privacy, which we acknowledged in our brief. You know, this is a wrought iron fence. There's no privacy. Any mailman, Amazon delivery person, Girl Scout selling cookies would walk through this place. Although there is a gate and maybe he had a reasonable expectation, I'm sorry, is what's relevant for Fourth Amendment considerations. So it's private space, but no expectation of privacy. Will that seem a little inconsistent? Well, he's not. I guess what I'm trying to say is, as far as when you're looking at the length of the intrusion, this is a front lawn. So maybe for, you know, dog sniff purposes, but when he committed a crime, when officers reasonably believed him to be committing a crime on a public way, following him onto his front lawn was not unreasonable, particularly considering where, which allowed them to follow him even inside his home. I have no further questions. I have a couple. First of all, when you talk about flight, I thought the testimony was that the defendant opened the gate and walked in. Was there any testimony about rushing or anything like that? And didn't the officer even concede that he wasn't running or anything, the defendant? Yes, Your Honor, the officer did concede that he wasn't running. The point is, and I say that it's flight, and I stand by that because there's no... Does it have anything to do with the cases when we first heard about this idea of headlong flight? You're not suggesting this is headlong flight, are you? Well, there's certainly one case a defendant cited that describes, you know, when they're explaining the defendant's flight, it was a quote, headlong sprint, but you don't have to be sprinting to attempting to flee from police officers. The point is, got out of his car and he told defendant to stop. Defendant, I think they said it was two to three car lengths ahead. He's at the next residence. He didn't stop. He kept walking and he walked through his gate. So that is fleeing, evading, attempting to remove himself from... That's how you would argue that this was flight, because there was an order to stop and he didn't. Correct. And he kept going the opposite way through it. Okay. Now, when you say that the warrant for Solano, that doesn't have anything to do with probable cause here, does it? Well, it is a consideration when you're looking at the totality of the circumstances. One factor is whether it's a high crime area. And here he's with a subject of a warrant going through a gate, and we know that the warrant is for a weapons offense for Solano. So it's, are the officer's fears heightened? Well, when did he find out that this person was... Did he say he knew Solano was the person that was being sought for the warrant? Officer Gonzalez? Yes. Yes, he did say that? Yes, Your Honor. And you're saying that the fact that another person has a warrant outstanding would go into the probable cause of the arrest of this defendant? I'm saying when you're... What case would you suggest even says that? I'm sorry. I'm sorry. I may have misunderstood. I'm not saying that Alicia Solano being president made officers reasonably believe he was drinking on a public way. No, that one doesn't have anything to do with the other. But why would that have anything to do then with the probable cause or the offense that the officer said he was arresting the defendant for? Mr. Martinez? You're right. And that's what I'm apologizing. I don't believe that Solano's president made it any more or less likely the defendant was drinking on a public way. My argument to that is when you're considering the totality of the circumstances and what the officers did, Solano went through that gate. They had a warrant for him. Police went through that gate also. And I'm not advocating that Solano's warrant gave the police car launch to search everyone in there or anything. But there was now defendant, this is when you consider his placing his hands in his pocket and elevating things to a next level. Had defendant complied and this just been a stop like Gaytan on the street, stops him for drinking, we would be in a different place. But defendant escalated the situation when he went with Solano into the gate, put his hands in his pockets and wouldn't move them. He brought things to the next level. So you're standing by this position that the fact that there was a warrant for Solano, for what offense we don't know, right? We do know it's a weapons offense. It's what? A weapons offense. Okay. But that is something that we should take into account in determining the totality of the circumstances or the court should have. Well, I think when Lozano, for example, mentions, you know, the courts can consider whether it's a high crime area and officer Gonzalez did say it's a high crime area. That's a factor to consider. And here we have, you know, a known criminal right there in the situation. Okay. I don't know that the warrant for someone in that particular area in any way correlates to high crime because someone is wanted on a warrant that if he's in an area, then that suddenly becomes a high crime area. I don't see that at all. Officer Gonzalez said it was a high crime area. That's right. He did. He did. My question was though, is this thing about the warrant for this other person? And your argument is, and I understand it, that it's part of the totality of the circumstances. What if this Supreme Court decision is retroactive? Does that have anything to do with, does Lange being retroactive have anything to do with the good faith exception? If it's retroactive, let's assume that Lange is retroactive to this particular time. Yes. How does that impact the good faith that you argue is present? Yes. Good faith is because officers were acting pursuant to the law that was binding at the time of the arrest. Well, when a court declares something is retroactive, is that not binding at that time? I'm not sure I understand. I don't think you can look at a case decided eight years after the fact to say whether there was a violation eight years prior to it being decided. However- I'm sorry, you go ahead. If that's the case and we're looking and saying that now it's a violation, whether the weapon is to be excluded depends on whether the officers were acting in good faith, and they can't be held to predict the future. They knew what was the law in 2013, and they acted reasonably on the law in 2013. Okay. I understand. But you would concede, wouldn't you, that if these facts happen today, good faith wouldn't apply because of Lange? Because of Lange. So Lange gave exigent circumstances that would have to be present, and this wasn't the crime of the century. There was no violence, no threat of danger. But one of the things Lange says to consider is whether there's the destruction of evidence, or none of that was laid out or presented at the argument because Lange didn't exist. That wasn't the rule at the time. But this would be much harder under Lange, yes. Well, the destruction of the evidence didn't really come about until the officer recovered the gun, but the arrest was for something entirely different, right? Correct. And we know that Gonzalez discarded the beer at some time. Yeah. Well, I'm not really talking about that fact. I mean, it was never recovered or whatever, but the probable cause that you've argued was present was when he was drinking or observed or thought to be drinking from an open bottle on the street. The gun didn't come into play until after. Correct. Okay. All right. I don't have any further questions. All right. Well, let's throw Lange out. Let's hypothetically throw Lange out. It's a hot day, and my next door neighbor invites me over for a beer, and I don't finish it, but I'm going to walk home. Now, you're telling me that it's reasonable, and I walk into my porch, are you telling me that it's reasonable under where for a police officer to come and arrest me on my porch after I just left my neighbor's house with a beer? I'm saying that in this case, there was probable cause to believe defendant was drinking on a public way. And even under Gaetan, there was, right, when they saw an unidentifiable cup of liquid, the court held that that was a proper terrorist stop. And yes, under where that case, as Lange noted, categorically permitted officers to pursue fleeing misdemeanors into their homes. All right. Thank you. Thank you, Mr. Gowan. Mr. Yeastie, you may proceed. I have a few points, your honor. First, Officer Gonzalez wasn't a ground scout going up that porch to sell cookies. He walked up those porch and grabbed my client by the arm, and that's the moment that the arrest was effectuated before there was any indication of a gun. And this is where I think the Seventh Circuit's Banks case is helpful, because it talks about what one has in mind, what an officer has an implied license to do and not do, and an officer arresting somebody on the porch is something they don't have an applied license to do. I'd ask this court to read very, very closely a couple of cases, because they do set that question of what was the legal landscape in 2013. One is where. And yes, Lange puts out a footnote saying that, briefly summarizing that it's on one side of a split of authority, because that's what the students who wrote the cert petition, Stanford and Ware, put in their cert petition. But Ware never actually articulates the categorical rule that the state wants. And without that categorical rule, it's not binding precedent that specifically authorizes the intrusion into the property for an offense so minor as drinking Corona standing on the sidewalk near one's home. And I do also feel like I have to answer some of these questions about the warrant. The reason we don't see the warrant being argued as an alternative basis is because the rule is that police need a search warrant in addition to an arrest warrant to arrest a suspect in the home of a third party. If they saw, you know, an officer who saw Solano sitting on the steps with a mere arrest warrant couldn't intrude into the property to effectuate that arrest without exigency. The fact the officer might have thought Solano had a warrant adds nothing to this case. And the notion that this is equivalent of some kind of Terry stop is incorrect. The officer is quite clear, and he corrects himself when he's about to testify others that because he goes into right into that pocket and pull to see what my client might have in there, that it has, it's a full, it's a full search warrant, and it requires to be a search incident to an arrest. The state doesn't make any kind of Terry theory below, and there's no Terry theory I know of that could justify the actions in, of the officer in this case regardless. Now, finally, just as a matter of fact, the state makes the argument that the orders to stop came in early. The officer's testimony on this is at most a fraction of a second. And that's not the kind of fraction of a second that would put the officer over the top as, as, as the probable cause. And just one more point is the notion that this is a high crime area would typically be relevant for Terry suspicious probable cause, but it doesn't give any support to the effect that for probable cause in this case, because the offense of the arrest is sipping from a Corona bottle on the sidewalk. And I don't know why that would be especially more likely to occur in this area of Little Village than, than stay, say Clark Street in Wrigleyville after a Cubs game. There just isn't anything about the notion of a high crime area without more detail that would say that, that when he was holding that Corona bottle, that he was especially likely to have taken a drink from it while out, while outside his home. And for those reasons, Your Honor, I'd ask that you reverse my client's convictions. Thank you. Thank you. Any other questions? No. Very well. Then the case was well briefed, well argued, and you both well prepared. We appreciate it. This case will be taken under advisement and a decision will be issued in due course. Thank you very much. Have a great day.